**U.S. ex rel. Rene SANTANA, Petitioner,**

v.

**Peter FENTON, Superintendent of Rahway State Prison, and The Attorney General of the State of New Jersey, Respondents.**

Civ. No. 79–3296.

United States District Court,
D. New Jersey.

Aug. 12, 1981.*

Roger A. Lowenstein and Zulima V. Farber, Roseland, N.J., for petitioner.

James R. Zazzali, Atty. Gen., Trenton, N.J. by Richard R. Uslan and Marc J. Friedman, Deputy Attys. Gen., Newark, N.J., with George L. Schneider, Prosecutor of the Pleas for Essex County by Hilary L. Bru-

---

* Reversed and remanded with instructions to dismiss for failure to exhaust state remedies available when the petition was filed, 685 F.2d 71 (CA 3, 1982), reh. den.; cert. den. —— U.S. ——, 103 S.Ct. 750, 74 L.Ed.2d 968 (1983).

nell, Asst. Prosecutor, Newark, N.J., for respondents.

## MEMORANDUM

BIUNNO, District Judge.

On the morning of December 16, 1974, armed robbers entered a basement apartment on Roseville Avenue, in Newark, NJ and announced a "hold up". One of the occupants, Remigio Sanchez, beat one of the robbers on the head with a baseball bat severely enough to cause his death. In the process of this confrontation, Sanchez himself was shot in the abdomen, and eventually died about a month later.

Two others, petitioner Santana and his co-defendant Rodriguez, were later indicted on two counts of felony murder, one count of attempted robbery, and a count of attempted robbery while armed.

Trial was to a jury, which returned verdicts of not guilty on all counts as to Rodriguez, and verdicts of guilty on all counts as to Santana. Santana has filed a habeas petition here under 28 U.S.C. § 2254.[1]

Of the persons in the basement apartment when the robbers entered, only one, Mr. de la Rosa, testified at trial. Sanchez, who had died, was not a witness even to the point of the offering of a dying declaration, N.J.Ev.Rule 63(5). Another person present, Guido Sanchez, along with his wife and children, had returned to Santo Domingo between the event and the trial, and were not witnesses who testified.

There was no doubt of the identity of one of the robbers, generally referred to by the nickname "Columbia". This was the robber who was beaten on the head with the baseball bat and who died after being taken to a hospital. He was, in fact, one of the corpus delicti.

The robbers had entered wearing ski masks, and after the shooting and beating were over in this unsuccessful robbery attempt, Columbia was left at the scene and when his ski mask was removed, was recognized. There was no claim that he was not at the scene or that he did not participate in the attempted armed robbery.

The state's testimony was that two masked and armed robbers entered the basement apartment. One of them, Columbia, was left there mortally wounded and the other escaped. A neighbor in the building, hearing the gunfire, looked to see what was happening and saw the escaping robber pull off his ski mask, roll it up and put it back on as a cap. This eyewitness at the scene identified the escaping robber as the

---

1. At the time of the trial, the only reported decision of an appellate court in New Jersey construed its felony-murder statute, N.J.S. 2A:113–1, to reflect a legislative intent that anyone participating in a robbery (or other enumerated offenses) should be chargeable for felony-murder "if the death of anyone ensues" from the committing or attempting to commit robbery. *State v. Canola*, 135 N.J.Super. 224, 343 A.2d 110 (App.1975). That case, like this one, involved a situation where an intended victim of the robbery attempt (here, Remigio Sanchez) killed a co-participant (here, Columbia) in an attempt to abort the robbery. Since two persons were killed (Sanchez and Columbia) there were two separate counts of felony-murder against Santana and Rodriguez as alleged participants in the attempted armed robbery.

After Santana's conviction and sentence, that ruling was reversed on appeal, *State v. Canola*, 73 N.J. 206, 374 A.2d 20 (1977) in an opinion limiting felony-murder responsibility to the "agency" theory and rejecting the "proximate cause" theory, anticipating the legislative change then under consideration in the draft of what later became the revised criminal code, Title 2C, enacted in 1979.

Accordingly, when Santana's appeal reached the Appellate Division, his conviction for the felony-murder of Columbia was vacated. This left standing the felony-murder conviction of Santana for the death of Sanchez, the robbery victim. This change is a change in local law. The change was applied for Santana's benefit, and the "error" carries no implication and is not involved in the present proceeding.

Of course, the fact that the jury returned a verdict in favor of Rodriguez, while finding Santana guilty, does not raise a federal constitutional question. See, *Standefer v. U.S.*, 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980) (defendant convicted on indictment charging "aiding and abetting" after principal was acquitted in separate trial in separate indictment); and *Harris v. Rivera*, 454 U.S. 339, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981) (one defendant acquitted and two others convicted, after joint bench trial without a jury).

petitioner, Santana. This witness was Roberto Gutierrez.[2]

There was considerable questioning of the witness de la Rosa, the only occupant at the time of the robbery to testify, as to the number of masked robbers who entered. He said on cross-examination that when interviewed by defense counsel through an interpreter, he had told them that there were three masked robbers, not two. He said that in a later conversation with the other confronted occupant, Guido, he agreed with Guido that only two robbers had entered, that he had never indicated

either two or three to the prosecution, and that his trial testimony before the jury that there were only two was the truth. He readily conceded that he had lied in various pretrial interviews. He said he had lied at the request of the deceased victim, Sanchez, to protect him. He said it was usual for him to lie to anyone he felt was "against him".

The foregoing summary outlines the testimony against Santana by persons at the scene of the crime. Other evidence offered by the State, if believed, tended to corroborate the identification of Santana.[3]

2. The witness Gutierrez turned up several weeks before he was called to testify, and his identity was disclosed at that time. He testified twice, once during a Wade hearing and the second time before the jury, through an interpreter. He said he had heard a number of shots on the morning of the 16th, went down to the basement door but found it locked. He returned to his room, heard more shots and went to the window from which he saw a man leave the basement from the outside entrance wearing a ski mask (a "skin") which he pulled off, rolled up and put on again as a cap. The man went along Roseville Avenue and turned down 6th Avenue. He identified the man as Santana. He did not see Rodriguez.

He said he had not been questioned until about two weeks before. At the time of the incident, police had arrived and he directed them to the basement apartment but was not otherwise questioned. His wife and child at that time had gone to Santo Domingo, and he followed them for a vacation. He said he was told by a friend, who knew what he had seen, that the police wanted to see him about his account, and that was the first he knew he was being sought as a witness.

These collateral aspects were explored in connection with claims of delayed discovery, and were gone into at the Wade hearing, as well as before the jury. Nothing of constitutional magnitude was shown, and the State agreed not to call him on its case in chief but only on rebuttal in order to provide the defense more time to prepare. His credibility, of course, was for the jury.

3. Santana's defense was alibi. Through his estranged wife, Maria Esperanza, he produced evidence that in December, 1974 he was living in Corona, New York in Arturo Garcia's home, and that she also lived in Corona. They had been separated only a few months, and it was his regular practice on Sunday to come to visit the children at about 12, 2:00 or 3:00 o'clock, and stay two or three hours. He would take the children out to eat, and for a ride and then take them back. He had a sister who ran a

restaurant in Queens that he would go to. She also said she had no reason to remember any particular Sunday.

Arturo Garcia was offered and testified that he met Santana by chance on a Sunday in Mid-December of 1974 at a restaurant of a friend on 39th Avenue in Corona, at about 5 PM. They stayed there a long time, then went to another restaurant owned by Santana's sister, but did not remember how long they stayed. Both then left to pick up Garcia's "wife", Maria Cepeda, at a friend's home and all three went to Garcia's home where Santana stayed overnight. He was with Santana all day on Monday (the 16th). They drove to Brooklyn to a candy store owned by "Georgie" where they stayed a good while, drinking beer they bought at a supermarket next door.

Maria Cepeda testified that Arturo Garcia and Santana picked her up on Sunday at a friend's home at 10:00 or 11:00 PM, and that all three went to the Garcia home to wrap Christmas presents. Santana stayed overnight and was still asleep when she left Monday morning at 7:30 AM. She did not know what Santana was doing at 8 PM, and did not know if he was in New Jersey at a christening.

After the State's rebuttal testimony through Gutierrez, Santana called George McNanney, an agent with ATF in New York. He testified that Santana had provided useful information about the shipment of guns out of Newark since January of 1974. He said he could not recall what Santana was doing on any particular day, and his testimony was stricken as irrelevant.

Also called was Edith Ann Newhoff, who said she had lived at 191 Roseville Avenue in December, 1974 and remembered a day when she heard shots. She said that the deceased Sanchez lived in a basement under her apartment. She said there were no shots in the morning but at night, just before dinner. There was no cross-examination.

Countering these alibi witnesses were: (a) Carmen Crespo's testimony that Santana was at her home on Sunday, for the christening, and

The witness Carmen Crespo, who was the widow of Columbia, testified that on the morning of the holdup the petitioner Santana came to her house and met with her husband, Columbia, and the co-defendant Rodriguez. Santana, she said, had guns and masks but said he was providing neither to co-defendant Rodriguez because he did not need them, he was to be the "lookout" and driver of the car.

Another witness, Pepin, testified that on the evening before, December 15th, a Sunday, he had been at the home of Carmen Crespo and Columbia for an informal christening of Rodriguez's baby. He said he spent most of his time there outside, playing craps, and that at one point Santana and Columbia insisted that he go along with them in a car for what he took to be a holdup at the same location that the Monday holdup took place. The witness de la Rosa corroborated him to the extent of testifying that an attempt had been made to break in to the basement apartment on Roseville Avenue on Sunday evening, without success.

Trial was conducted along two major lines: (1) cross-examination of the major witnesses for the State by attacking their credibility through admittedly inconsistent out-of-court statements, bias, interest and the like, and (2) alibi witnesses whose testimony was capable of raising a reasonable doubt that each of the defendants participated in the crime. The heaviest attacks were to the credibility of Carmen Crespo, the widow of the robber Columbia, and to the witness de la Rosa who was in the basement apartment when the robbers appeared. The cross-examination for both Santana and Rodriguez was thorough and skillful but in the end raised questions of credibility for the jury.

The verdicts returned reflect the jury's evident conclusion that there was a reasonable doubt that Rodriguez was at the scene, despite Carmen Crespo's inculpatory testimony about his presence at her house on the morning of the 16th when she said Santana distributed guns and masks. They evidently did not harbor doubts about Santana's participation, possibly due to the eyewitness testimony of the neighbor placing him at the scene of the crime, coupled with the corroborating testimony.

The petition does not question the adequacy of the evidence to support the

on Monday morning when he brought guns and masks to Columbia and Rodriguez; (b) the testimony of Pepin that he had gone with Columbia and Santana by car from the christening to 6th Avenue just off Roseville Avenue, and that there was talk of a "rip-off"; (c) testimony of La Costa that he know both Santana and Rodriguez and that the Rodriguez baby was baptized December 15, 1974 because he stayed at the Rodriguez home at the time and was helping them get the "beer and stuff" for the baptism. He saw Santana that evening when he came by at 6 o'clock. Later that evening, during a crap game on Broadway (Newark), he asked Santana, "Are you still packing your rod?", and Santana said, "Yeah", opening his coat so La Costa could see a pistol. La Costa said he stayed overnight with the Rodriguez' and on Monday morning Columbia came by and asked Rodriguez to take him for a ride "to pick up my money." Rodriguez replied that he and La Costa were going out to look for a job, and Columbia said they would only be gone "a minute". La Costa asked to go along, but Columbia said to wait there as Rodriguez would be right back. La Costa dressed and went to the street but did not see either Columbia or Rodriguez, but saw Santana standing at the alleyway of Columbia's house. He turned to close the door and when he looked again did not see Santana. He learned about 3 or 4 PM that Columbia had been killed. He saw Santana's car, as shown in DS–10A, B and C about 1 or 2 AM late Sunday night, with Santana driving it; (d) Martin Helmick testified that on the day Columbia was killed, he saw Santana in his car right in front of his window; he got out, opened the trunk and took out a "tobogan" (something kids wear in winter when it is cold) that was brown, all rolled up. He did not see Santana get into Rodriguez' car across the street, or see where he went; he came back 20 or 30 minutes later, opened the trunk, threw whatever he had inside, got in the car and drove away. He was shown a ski mask, S–1 (removed from Columbia) and said what he saw was nothing like that but was much longer and was brown.

The court also notes, in passing, that in his "truth statement" dated October 2, 1975, evidently sent to one Steve Balducci, Santana gives his home address on December 15, 1974 as 115 Delavan Avenue, which is near the corner of Broadway, in Newark. This statement was not before the jury but might well have been had Santana testified.

**756**

verdicts against Santana under the test articulated by *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Although not raised, the court has reviewed the lengthy trial transcript several times with this test in mind, and finds that the test has been met.

Rather, the focus of the collateral attack is aimed at two related items: one is that after the evidence was closed and all parties had rested, and after both the defense and the State had completed their summations, petitioner Santana through his attorney and by his own statements to the trial judge asked that he be allowed to take the stand and testify, which he had not done during the trial; and, two, the request was made (it was said) because of a passage during the State's summation as part of the argument to rehabilitate the credibility of the witness Carmen Crespo, who had been the subject of vigorous and robust attack during the summations of both defense attorneys. The background for the position rests on peripheral testimony which requires review for a clear understanding.

Both Carmen Crespo and Pepin testified that on Sunday, December 15, 1974, the day before the robbery, an informal christening party had been held at the home of Columbia and Carmen Crespo, for the baby of co-defendant Rodriguez and his wife. Carmen Crespo testified that Santana was present, and so did Pepin. Carmen Crespo also testified that petitioner Santana had been the baby's sponsor or godfather at this ceremony.

After the vigorous and robust challenges by defense counsel to the credibility of Carmen Crespo in their summations, grounded on legitimate foundations of inconsistent statements on cross-examination, the State responded, at one point, to ask the jury what reason Carmen Crespo would have had to lie about Santana's service as the baby's godfather. At one point he asked

the jury whether any witness had denied that Santana was the godfather.

As the summations ended, Santana's attorney objected to the prosecutor's comment as an adverse remark on Santana's failure to testify. A lengthy colloquy ensued, carried over to the next morning, the main subject being whether the testimony had indicated that persons other than the witnesses who testified, or Columbia (who was dead) or Santana or Rodriguez, could have testified on the point, i.e., whether in the circumstances of the case, the remark implied that Santana's failure to testify left that evidence uncontradicted.

The prosecutor responded that the comment was intended to do nothing more than support the credibility of Carmen Crespo which had been the subject of heavy challenge on cross-examination and in both defense summations.

The court denied the mistrial motion on the basis that a comment that certain evidence was uncontradicted is not an improper reference to defendant's failure to testify when the record indicates that persons other than the defendant could have contradicted the evidence if it were not true, and did not testify.

██ This is no doubt the usual rule, but in the peculiar circumstances of this case, the court is of the view that the comment, even though not so intended, did highlight and emphasize the failure of *both* defendants to testify, and it is unable to conclude that the error was harmless beyond a reasonable doubt.[4]

While no two cases are ever alike, making it usually impossible to locate a reported decision still in force that is "on all fours", the court is satisfied that in this case the comment falls on the wrong side of the line.

For a very long time it was the well-established principle that comment on failure to testify in a trial in a State court was a matter within the authority of the States,

---

**4.** This ruling by no means implies anything on the question whether Santana is guilty or not guilty, just as the jury's not guilty verdict for Rodriguez is not a decision that he is innocent. A not guilty verdict means no more than that the jury harbored a reasonable doubt of guilt. Allowance of a conditional writ means no more than that petitioner was "not convictable" under the circumstances of the trial, and must be tried again if the conviction is to stand.

since the Fifth Amendment applied only to the federal government. See, for example, *Twining v. N.J.*, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908), and *Adamson v. California*, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947).

*Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) made a complete turnaround and declared that the Fifth Amendment privilege against self-incrimination applied to the States through the due process clause of the Fourteenth Amendment. *Malloy* did not involve the precise question raised here. It involved the question whether a witness at an investigatory hearing (rather than a defendant on trial) could lawfully decline to answer questions about an earlier criminal offense for which he had already been convicted and sentenced.

However, any doubts on that score were laid to rest in *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). At issue there was the validity of a provision of the California Constitution allowing comment on a defendant's failure to explain or deny by his testimony any evidence or facts in the case against him. It was held that the ruling in *Malloy* "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."

A similar rule had long prevailed in New Jersey, with re-enactment as recently as 1960 in N.J.S. 2A:84A–17, which limited comment to cases where there was direct evidence of facts which tend to prove some element of the crime and which facts, if untrue, the defendant could disprove by his own testimony. The comment allowed was also narrow, namely that the jury could draw an inference that he could not truthfully deny those facts. This statute has been declared ineffective in view of *Griffin*. See *State v. Aviles*, 45 N.J. 152, 211 A.2d 796 (1965); *State v. Lanzo*, 44 N.J. 560, 210 A.2d 613 (1965); *State v. Deatore*, 70 N.J. 100, 358 A.2d 163 (1976).

Since *Griffin* the decisions of the Supreme Court have displayed no indication of a tendency to modify the intent that the Fifth Amendment guarantee be given its full force.

Thus, *Lakeside v. Oregon*, 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978) upheld an instruction to the jury to caution it against drawing any adverse inference from a failure to testify, even over the objection of defendant's attorney.

More recently, in *Carter v. Kentucky*, 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981), the court set aside a conviction in a case where the State court declined a "no inference" instruction requested by the defense, even though local law held that if a defendant made no request to testify, there was to be no comment on the subject at all.

*Carter*, as well as other decisions, recognize that it is only the Fifth Amendment aspect that raises the constitutional infraction. The fact that a defendant was not allowed to testify at all at common law, and that his competence to do so arises only from federal or state statute is not controlling. The federal statute is now 18 U.S.C. § 3481, enacted March 16, 1878. The New Jersey statute, now N.J.S. 2A:81–8, had already been enacted by the time of the decision in *Disque v. State*, 49 N.J.L. 249, 8 A. 281 (Sup. 1887), where Chief Justice Beasley observed:

> "The only objection made at the time to that line of inquiry was that it was 'not a proper subject matter of cross-examination.'"

> "The objection has no legal basis. The subject of interrogation was clearly relevant, as it tended to show the malice of the defendant towards the deceased, and the extent of the cross-examination of a witness into pertinent facts not touched by the direct examination is a matter resting entirely in the discretion of the trial court. *Since the passage of the statutes capacitating parties as witnesses,* it has been the general practice, both with respect to civil and criminal procedure, to permit such testifying party to be cross-examined to the whole case, and such judicial action, being founded in discretion, is not a matter on which error can be assigned."

(Emphasis added)[5]

The rule of *Disque* is continued by the formulation of N.J.Ev.Rule 25(d), N.J.S. 2A:84A–19(d), that:

"... the accused in a criminal action or a party in a civil action who voluntarily testifies in the action upon the merits does not have the privilege to refuse to disclose in that action any matter relevant to any issue therein."

The federal rule is not as clear or explicit. As originally proposed, Fed.Ev.Rule 611(b) would have restored the English rule allowing cross-examination of every witness, including a party and a defendant in a criminal trial, on any matter relevant to any issue in the case, without requiring that cross be limited to the scope of the direct.

The Advisory Committee's Note observes that the constitutional issue of the extent to which a defendant who elects to testify waives his privilege against self-incrimination is an open question in view of *Simmons v. U.S.*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). In the *Simmons* context of barring the use of defendant's testimony given in a pretrial hearing, as evidence on the government's case in chief, it is still not decided whether such testimony may be used by the government if the defendant testifies at trial, either on cross-examination or for rebuttal. See, *U.S. v. Salvucci*, 448 U.S. 83, at 94, 95, 100 S.Ct. 2547 at 2554, 2555, 65 L.Ed.2d 619, at 629–630 (1980). In any event, this formulation was not adopted and the question remains open.

This subject is dealt with because, after the mistrial motion was denied, Santana's attorney and Santana himself informed the court that he wished to testify that he was not the godfather of the Rodriguez baby. This was after the summations had ended

and before the charge, and involved the complicating factor of reopening the evidence.

Santana interjected:

"MR. SANTANA: Here is the best witness to say who is the godfather of his child.

"THE COURT: Indicating Mr. Rodriguez."

The prosecutor's response, a few pages later was:

"MR. FUSCO: Your Honor, if I might be heard. Let him testify, but as I understand it once he gets on that witness stand he is subject to cross-examination on everything. I would like to have him testify."

Petitioner argues here that he was deprived of due process under the Fourteenth Amendment because he never waived his right to testify.

The point is novel, but not well taken. The right not to be compelled to testify is what is protected by the Fifth Amendment. The right to testify is statutory, and as both the federal and New Jersey statutes make clear, in order to testify he must make a "request", or "offer himself as a witness". These statutory expressions are deliberate and reflect a legislative intent to record that the defendant has thereby waived the protection of the Fifth Amendment.

There is a discussion of the question, but no decision, in *U.S. ex rel. Wilcox v. Johnson*, 555 F.2d 115 (CA 3, 1977) suggesting that there may be a federal constitutional right to testify arising from the due process clause of the Fourteenth Amendment, and referring to other opinions that have discussed the point. However, the discussion is dictum because the decision was ground-

**5.** For civil actions, the earliest New Jersey statute allowing a party to be a witness despite his interest appears to be P.L.1859, p. 489, included in the N.J. Revision of 1877 as section 3 of the Evidence Act.

For criminal cases, the earliest New Jersey statute allowing a defendant to testify "if he shall offer himself as a witness" appears to be P.L.1871, p. 12, included in the N.J. Revision of 1877 as sec. 8 of the Evidence Act.

These are no doubt the statutes referred to in the 1887 decision in *Disque*. Chief Justice Beasley was one of the three commissioners named in 1871 to prepare the Revision of 1877. So was Justice David Depue, who sat on the panel in *Disque*. Both were undoubtedly quite familiar with these statutes. See Prefatory Note to the Revision of 1877.

ed on the fact that the accused was put to the choice of not taking the stand with trial counsel (who believed his testimony would amount to perjury), or of taking the stand *pro se,* with counsel withdrawing, thus depriving him of his Sixth Amendment right to counsel. The gist of the holding is that the defendant was entitled to both the statutory right to testify and the constitutional right to counsel, and that the trial court's ruling put him to a choice that should not have been imposed. 555 F.2d at 120–121.

In the present case, the record is clear beyond doubt that Santana's counsel rested his case before summations began, without calling Santana. He and Santana were then fully aware of what the testimony had been. The Fifth Amendment right not to incriminate oneself being absolute and unconditional, the failure to call him required no explanation, although the better course is to conduct a voir dire of the defendant outside the hearing of the jury.

■ On the other hand, had Santana indicated a desire to testify before the evidence was closed, a voir dire examination of him to assure that he was voluntarily making a relinquishment of a known right of constitutional magnitude would have been vital, and is the usual practice in the federal courts. The voir dire explores his awareness that he may be cross-examined, not only as to matters dealt with on direct, but also on matters of credibility and, if N.J.Ev. Rule 25(d) is valid, on any matter relevant to any issue in the case.

■ As with the voir dire of a witness ordered to answer under 18 U.S.C. § 6002, or an allocution on a guilty plea taken under oath pursuant to Rule 11, F.R. Crim.P., the court is obliged to inform that the testimony, if given, may be used in a prosecution for perjury or for giving a false statement. It also assures that the particular decision is that of the client, and his alone, after having the benefit of such advice and consultation as he desires.

■ Just as a defendant may simply plead "not guilty", without any explanation or voir dire, and thus secure to himself all his constitutional rights to trial by jury and the bundle of rights that accompany that trial, so he may simply make no "request", or not "offer himself as a witness" in order to retain his constitutional right not to be compelled to incriminate himself.[6]

A different set of circumstances arises when the defendant wants to testify because then the record ought to show an intelligent and voluntary relinquishment of known rights under the Fifth Amendment, just as the same inquiry must be made when a defendant wishes to waive indictment by a grand jury, or enter a plea of guilty.

■ The claim that Santana did not waive his statutory right to offer himself as a witness accordingly does not raise a federal constitutional issue and provides no ground for issuance of the writ.

Although the question is a close one, in the rather unusual circumstances of this case, with several key witnesses open to strong attack on matters of credibility, and with some confusion arising from the rather frequent interruptions in the trial, the prosecutor's comments are found to amount to a not permissible invasion of Fifth Amendment rights, particularly since the same point of sustaining the credibility of Carmen Crespo could have been argued legitimately in other ways. There were other witnesses, not open to this kind of attack, who established his presence in Newark on both the 15th and the 16th, in contrast to his alibi witnesses who placed him in New York and who were not certain of the dates. The argument to rehabilitate Carmen Crespo could have been made effectively by reference to the testimony of those witnesses, who confirmed his presence not only in Newark but at the scene of the crime itself. Reminders of this corroborating evidence would not only be far more effective a reason to accept Carmen Crespo's testimony of his presence, but it would completely

---

**6.** New Jersey distinguishes between the Fifth Amendment status of an ordinary witness and that of the accused in a criminal action. N.J. Ev.Rule 23(1) expressly states that the accused has "a *right* not to be called as a witness and not to testify." (emphasis added).

avoid any adverse implication of his failure to testify.[7]

Both defendants asked the trial judge not to instruct the jury in regard to failure to testify, and he did not. As is well-known, the professional view of experienced trial attorneys is divided on the question whether the instruction helps or hurts. In view of *Lakeside,* the prudent course may be to give the instruction, whether requested or not. This point is not seen as being of constitutional magnitude in this case since both defendants did not want the charge.

In view of the findings and conclusions reached in this ruling (a) there is no need for an evidentiary hearing here and (b) the collateral issues raised need not be decided.

Petitioner will submit an order for a conditional writ after conferring with respondents to ascertain a reasonable time within which to re-assemble the witnesses for the State and for a new trial to begin. To the extent that any witness at trial may be unavailable, their entire testimony at the first trial may be read. N.J.Ev.Rule 63(3); Fed.Ev.Rules 804(b)(1) and 1007.[8]

---

**7.** Although not argued here in this form, the comment objected to is obviously incorrect as a matter of fact. If believed, the testimony of the alibi witnesses was that Santana was in New York, not at Carmen Crespo's house in Newark, on Sunday, December 15, 1974, and by implication these witnesses denied that Santana served as godfather at the christening that day.

**8.** See, *U.S. v. Faison,* 679 F.2d 292 (CA 3, 1982), however.