757 F.2d 223
 23 Ed. Law Rep. 885
 Richard E. CORSTVET, Plaintiff-Appellant,
v.
Dr. Lawrence BOGER, President, Oklahoma State University, in
his official capacity; Patrick Morgan, Dean, College of
Veterinary Medicine, Oklahoma State University, in his
official and individual capacity; Carolyn Savage, Chairman,
Byrle Killian, Vice-Chairman, Jack Craig, Edwin Ketchum, H.
Harber Lampl, Ed Long, Rusty Martin, Dr. John Montgomery,
and Robert Robbins, Members of Oklahoma State University
Board of Regents, in their official capacities and
individually, Defendants-Appellees.
 No. 83-1124.
 United States Court of Appeals,
Tenth Circuit.
 March 12, 1985.
 
 Louis W. Bullock of Bullock & Bullock, Tulsa, Okl., for plaintiff-appellant.
 H. Leonard Court of Crowe & Dunlevy, Oklahoma City, Okl. (Charles E. Drake, General Counsel, Okl. State University, Stillwater, Okl., and Tom L. King of King, Roberts & Beeler, Oklahoma City, Okl., with him on brief), for defendants-appellees.
 Before BARRETT, Circuit Judge, and BREITENSTEIN and DOYLE, Senior Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 Richard E. Corstvet (Corstvet) appeals from a jury verdict finding that he was afforded due process in his termination as a fully tenured professor in the college of veterinary medicine at Oklahoma State University (OSU). Corstvet was terminated by OSU's regents in accordance with a recommendation made by OSU's president that Corstvet be terminated for his participation in an act of moral turpitude.
 
 
 2
 Corstvet initiated this civil rights action in accordance with 42 U.S.C. Sec. 1983 against the president, the dean of veterinary medicine, and the regents of OSU,[1] seeking reinstatement, back pay, and damages. He alleged that he was denied due process in his termination, that the policies and procedures of OSU were violated, that the regents violated Oklahoma's open meeting law, and that the standards used in his dismissal were overly broad and vague. Within their answer, appellees demanded a jury trial. Corstvet subsequently amended his complaint by deleting his request for damages. Corstvet also moved to have the case removed from the jury trial docket; this motion was denied. After a two-day trial, the jury returned a verdict in favor of appellees, specifically finding that Corstvet's termination was not in violation of his due process rights.
 
 
 3
 On appeal Corstvet contends that moral turpitude is not involved in this case and that the only issue under the guidelines of the Association of American University Professors is whether the incident surrounding his termination affected his teaching ability. Corstvet also contends that he was denied due process, even though the proper administrative procedures for affording due process were followed, because of the appellees' alleged predisposed bias to terminate him. In view of these allegations, we will develop the facts surrounding Corstvet's termination in detail.
 
 
 4
 During early May, 1981, the OSU police department began an undercover operation to investigate numerous complaints it had received relative to sexual solicitations in the men's rooms of the OSU Student Union Building. On Friday, May 8, 1981, Raymond Copeland, an OSU police officer, operating in an undercover capacity, entered a second floor men's restroom in the Student Union at approximately 5:30 p.m. and occupied a bathroom stall. Copeland went to the restroom after he had observed several notes soliciting homosexual acts written on the restroom walls which stated in part: "I'm over 35, 5:30 p.m. Fri. here." (R., Pl.Ex. 2.)
 
 
 5
 At the time Copeland entered the stall, he noticed that the stall next to him, adjacent to the wall where the notes had been written, was occupied. Several minutes after Copeland had occupied the stall, he received a note wrapped around a pen from the person (later determined to be Corstvet) occupying the adjoining stall. After several notes were exchanged between the pair, Copeland arrested Corstvet as the two men exited the stalls. The notes, initiated by Corstvet read:
 
 
 6
 Interested in what? Did you leave the note?
 
 
 7
 That's why I'm here! No chains!
 
 
 8
 Ok, let's go outside and talk.
 
 
 9
 There's nobody in here. What do you want?
 
 
 10
 Ass--you?
 
 
 11
 Sounds good!
 
 
 12
 Ok, let's go talk.
 
 
 13
 (R., Def.Ex. 33.) (Underlining denotes Corstvet's admitted writing on the notes.)
 
 
 14
 Although formal charges were not brought against Corstvet, he was arrested for making and soliciting a lewd and indecent act, and transported to jail. Once at jail, and after being advised of his Miranda rights, Corstvet related to Copeland that: he was bisexual and had sought professional help; he had solicited lewd acts in the Student Union restrooms approximately four times previous to his encounter with Copeland; he had information about a prostitution ring; during the last few years he had felt the need to have homosexual acts and he had used the restrooms as a contact point; and it was common knowledge that the Student Union was the contact point for such acts but he could not give further information because he was a loner and did not deal with large groups of homosexuals.
 
 
 15
 At trial Corstvet acknowledged passing the notes to Copeland, and that, contrary to what may appear, the notes were heterosexually oriented. Corstvet also testified that he went to the restroom to establish contact, ultimately, with a lady named Joan whom he had met earlier by the same means and with whom he had sexual relations, and that in passing the notes, he thought he was making contact with the same person he had previously contacted, a man named Mike. On cross-examination Corstvet stated that he really did not know what the definition of moral turpitude was and that "my idea of moral turpitude is that I didn't hurt anybody." (R., Vol. VII at 95.) Corstvet stated that his action was not socially acceptable to him, id. at 96, that he felt that the committee hearing members were all fair, and that he was able to present all the evidence he wanted to present at the hearing.
 
 
 16
 An article detailing Corstvet's arrest, without mentioning his name, appeared in a local newspaper approximately one week after his arrest on May 14, 1981. On May 21, 1981, appellees Dr. Boger, OSU's president, and Dr. Morgan, dean of the veterinary medicine college, met with OSU's chief of security and its legal counsel to discuss the incident. At the meeting, President Boger related to Dean Morgan that Corstvet was the professor involved in the incident reported in the newspaper.
 
 
 17
 Subsequent to the May 21, 1981, meeting, Dean Morgan and another department head, Dr. Ewing, met with Corstvet and discussed the incident and the various alternative ways in which it might be resolved. After the meeting, Dean Morgan met again with President Boger, at which time Boger related that a decision on Corstvet's future at OSU would not be made until such time as a full and complete investigation had taken place.
 
 
 18
 On May 22, 1981, the OSU regents met for a regular session. During the meeting, several board members expressed concern about the alleged solicitation of homosexual activity on the campus:
 
 
 19
 Dr. Montgomery moved and Mr. Lampl seconded that the Board of Regents express the position that acts such as have been alleged of homosexual solicitation are utterly unacceptable by this Board on a University campus and further the Board emphatically states its unequivocal support to the OSU administration in the curtailment of public solicitation of homosexual activity which is alleged to presently exist on the campus of Oklahoma State University.
 
 
 20
 Mr. Martin expressed concern that if an employee has engaged in public solicitation of homosexual activity as has been alleged and there is sufficient evidence that this happened, such employee or employees should be dismissed from duties forthwith. He stated that he is concerned about the apparent tendency to liberalize policies regarding dormitory visitation, alcohol consumption at off-campus activities, and the chaperone policy. He said he feels that parents and taxpayers as a whole do not want to see a lowering of moral standards at Oklahoma State University. He feels that something should be done so that it will be understood that OSU is condemning activities that tend to weaken the moral fiber of our society. Mr. Martin further stated that Freshmen still need a little guidance. (R., Pl.Ex. 31.)
 
 
 21
 An informal committee of impartial OSU faculty members was subsequently appointed by the chairman of the OSU faculty council. On June 11, 1981, the committee recommended that: Corstvet not be terminated; Corstvet be placed on probation and undergo counseling with the understanding that he be terminated immediately if such an incident reoccurred; and if resignation or termination were the only acceptable alternatives, Corstvet should be given three months to finish his work and seek other employment.
 
 
 22
 On June 16, 1981, after he had received the committee's recommendations, Dean Morgan notified Corstvet in writing that he was recommending that he (Corstvet) be terminated because "you have admitted and acknowledged committing a series of deviant sexual acts, including your recent solicitation of a lewd act in a men's restroom in the Student Union ... which conduct constitutes moral turpitude and exhibits a pattern of unfit ... behavior for a public university faculty member." (R., Pl.Ex. 6.) Dean Morgan also informed Corstvet that he had fifteen days within which to dispute his (Morgan's) decision and bring the matter before a hearing committee which would make its recommendations to the president of OSU. Id.
 
 
 23
 On July 7, 1981, after the fifteen days had elapsed within which Corstvet was to notify Dean Morgan of his intent to dispute the decision to recommend termination, Dean Morgan received a letter from Corstvet's attorneys objecting to the proceedings as they had developed. A formal hearing was requested.
 
 
 24
 On July 15, 1981, Corstvet was afforded a formal hearing, at which time he was represented by counsel and allowed to testify. The formal hearing, which was tape-recorded, was held before a grievance committee composed of five OSU faculty members randomly selected by the chairman of the faculty council. After the hearing, the hearing committee presented to President Boger its findings and recommendations, which stated, inter alia: the evidence did not justify termination; Corstvet's duties at OSU should be restricted to research and nonteaching duties; Corstvet should immediately seek professional help, and regularly report to the administration so that he could return to the classroom when the administration felt such would be appropriate; and Corstvet should be required to sign a statement agreeing to voluntarily resign upon the reoccurrence of a lewd and indecent act. Within its report the committee found that Corstvet had admitted his encounter with Copeland and that Corstvet's admitted behavior did constitute "soliciting a lewd and indecent act as described in 21 O.S. Secs. 1029 and 1030 and constituted moral turpitude consistent with the vague and broad definition offered in Black's Law Dictionary." (R., Pl.Ex. 9.) Black's Law Dictionary, Fourth Edition, defines "moral turpitude" as "An act of baseness, vileness or depravity in the private and social duties which a man owes to his fellow man, or to society in general, contrary to the accepted and customary rule of right and duty between man and man."
 
 
 25
 President Boger studied the committee's report and recommendations for several days. He also listened to the entire tape-recorded hearing. On July 23, 1981, President Boger reached a decision that he would recommend to the board of regents, who were meeting the next day, that Corstvet be terminated. President Boger then telephoned Corstvet's attorney and, after inviting the attorney and/or Corstvet to visit with him personally, read to Corstvet's attorney his draft letter recommending Corstvet's termination. President Boger also advised Corstvet's attorney of the manner in which his recommendation would be presented to the regents. On the evening of July 23, 1981, the regents were presented with President Boger's recommendations, together with materials he had prepared in support thereof. On July 24, 1981, the regents, after reviewing the matter in executive session, voted to terminate Corstvet. Subsequent thereto, although Corstvet was notified of his right to request a post-termination hearing from the regents, he did not do so. It is uncontested that, disregarding this incident, Corstvet was considered a very good teacher with excellent research capabilities.
 
 
 26
 On appeal, Corstvet contends: (1) the court wrongly instructed the jury on the law of bias; (2) the evidence does not support a finding that the plaintiff received due process; (3) the court erred when it ruled inadmissible the A.A.U.P. guidelines; (4) the dismissal of the plaintiff was in violation of the Oklahoma Sunshine Law; (5) the court erred when it ruled that the termination of the plaintiff was in accordance with the policy of Oklahoma State University; (6) the court erred when, in light of the vagueness of the regulations relied upon, it ruled that there was adequate cause for dismissal of the plaintiff.
 
 
 27
 During oral argument, Corstvet's attorney discussed in detail the two controlling issues on appeal, i.e., (1) whether moral turpitude is involved in this case, and (2) whether he was denied due process in his termination. Because of their dispositive nature, our review will be limited to these two issues.
 
 Moral Turpitude
 
 28
 Corstvet has argued repeatedly and adamantly that this case does not involve moral turpitude and the real issue is whether the incident affected his teaching ability. We disagree. Corstvet's argument that his case does not involve moral turpitude is specious at best.
 
 
 29
 21 O.S. Sec. 1029 provides that it shall be unlawful to engage in prostitution, lewdness, or assignation or to solicit, induce, entice, or procure another to commit such an act. Under 21 O.S. 1030, prostitution is construed to include the giving or receiving of the body for sexual intercourse for hire or the giving or receiving of the body for indiscriminate sexual intercourse without hire. Sec. 1030 also construes lewdness to include the making of any appointment or engagement for prostitution or lewdness or any act in furtherance thereof. Under 21 O.S. Sec. 886, "the detestable and abdominable crime against nature, committed with mankind or with a beast," includes sodomy as well as other unnatural acts.
 
 
 30
 At the time of his arrest, and after being advised of his Miranda rights, Corstvet related to the arresting officer that: he was bisexual; he had solicited lewd acts in the Student Union restrooms on prior occasions; during the last several years he had felt the need to have homosexual acts and that he had used the restrooms as a contact point; and that, although it was common knowledge that the Student Union was the contact point for such acts, he could not give additional information because he was a loner and did not deal with large groups of homosexuals. At trial Corstvet acknowledged passing the notes to the undercover officer and he testified that he had gone to the restroom to establish contact with a woman named Joan, with whom he had previously had sexual relations. We hold that Corstvet's statement made to the arresting officer, and his testimony at trial, establish acts of moral turpitude, in violation of the laws of Oklahoma. Our holding in this regard is further supported by the independent findings of Corstvet's peers, including the informal review committee, Dean Morgan, the formal hearing committee, and also by Dr. Boger, OSU's president.
 
 
 31
 Although the informal review committee stated that "we do not recommend immediate termination for cause based on acts of moral turpitude," it also stated: "We have concluded that while subjective interpretations may allow the assignment of this act as one of moral turpitude, the penalty attached is too severe for this case," and "All things considered ... Corstvet should be given a second chance...." (R., Pl.Ex. 3.) The committee also recommended that Corstvet be placed on probation subject to "his willingness to sign a statement agreeing to immediate dismissal with any acts of reoccurrence or evidence thereof." Id. (Emphasis supplied.)
 
 
 32
 Dean Morgan, after considering the recommendations of the informal review committee, decided to recommend termination because Corstvet had "admitted and acknowledged committing a series of deviant sexual acts, including your recent solicitation of a lewd act in a men's room." (R., Pl.Ex. 6.) Dean Morgan further concluded that Corstvet's "conduct constitutes moral turpitude and exhibits a pattern unfit ... for a ... faculty member." Id.
 
 
 33
 The Hearing Committee for a Formal Hearing found that: Corstvet had used the Student Union restrooms to arrange for heterosexual activity with a group of people; Corstvet was attempting to again arrange such activity on May 8, 1981, by passing notes to an unknown person in an adjoining restroom stall; Corstvet's activity constituted "soliciting a lewd and indecent act" as described in 21 O.S. Secs. 1029 and 1030; Corstvet's actions constituted "moral turpitude" as defined in Black's Law Dictionary; although Corstvet had stated his intentions were heterosexual, there is evidence to support the claim of homosexual behavior; the evidence of homosexual behavior is not conclusive; and that Corstvet may be suffering from an emotional disorder resulting from severe stress caused by his wife's chronic problem of alcohol abuse, a breakdown of family life, and a son's criminal conviction. Thereafter, although the hearing committee recommended against termination, it did recommend that Corstvet sign a statement "agreeing to voluntarily resign immediately upon the reoccurrence of a lewd and indecent act." (R., Pl.Ex. 9.) (Emphasis supplied.)
 
 
 34
 OSU's President Boger, after accepting the findings of the hearing committee, decided, contrary to the hearing committee's recommendations, to recommend that Corstvet be terminated. In detailing his decision to recommend that Corstvet be terminated, President Boger specifically noted that the findings of the hearing committee established "grossly unbecoming and unfit behavior" for an OSU professor. (R., Pl.Ex. 10.) The president also noted that the Committee's finding, with which he agreed, i.e., that Corstvet's behavior constituted "moral turpitude," was highly significant and confirmed to his satisfaction that "there is sufficient cause for immediate termination." Id.
 
 
 35
 We hold that the evidence overwhelmingly established that Corstvet's conduct involved moral turpitude. Corstvet's arguments to the contrary are totally devoid of merit.
 
 Due Process
 
 36
 Corstvet contends that he was denied due process when the district court failed to instruct the jury on the guidelines of the American Association of University Professors (AAUP). He contends that under those guidelines moral turpitude is not involved and, accordingly, the only issue is whether or not the incident affected his teaching ability. Corstvet presents this argument in a vacuum, without authority to support his assertion that the court's refusal to instruct on the guidelines of AAUP, ipso facto, gave rise to a denial of due process. It is not significant, in any event, in light of our holding that Corstvet's actions involved conduct of moral turpitude. The sole issue is not simply whether the incident affected his teaching ability, as he vehemently contends. The issue is whether Corstvet was afforded due process and properly terminated in accordance with OSU's Faculty Handbook Supplement Appendix D, which specifically provides that a faculty "appointment may be terminated for causes such as acts of moral turpitude...." (R., Pl.Ex. 26 Sec. 1.10.3.)
 
 
 37
 Corstvet further contends that although due process procedures were followed, he was nevertheless denied due process because of the predetermined bias on the part of the OSU officials to terminate him. Corstvet argues that the ultimate arbiters of his fate, the regents, acted with little understanding of the facts and concluded that dismissal was the only appropriate sanction. Corstvet contends that the regents had a predetermined bias against him as reflected by their statement issued during the course of their May 22, 1981, meeting, which included:
 
 
 38
 that the Board of Regents express the position that acts such as have been alleged of homosexual solicitation are utterly unacceptable by this Board on a university campus and further the Board emphatically states its unequivocal support to the OSU administration in the curtailment of public solicitation of homosexual activity.
 
 
 39
 We hold that neither this statement, nor any of the evidence in this record, corroborates Corstvet's allegation that the regents had a predisposed bias to terminate him in violation of his due process rights. The record clearly reflects that Corstvet received more than adequate due process.
 
 
 40
 The fundamental right of due process is the opportunity to be heard at a meaningful time in a meaningful manner. Walker v. United States, 744 F.2d 67 (10th Cir.1984) citing Matthews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976) (quoting Armstrong v. Monzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). An opportunity for a hearing provides due process whenever a party is reasonably notified of the pendency of an action against him and afforded the opportunity to appear. McKee v. Heggy, 703 F.2d 479, 481 (10th Cir.1983). As set forth, supra, Corstvet testified on cross-examination that he felt all the committee members were fair and that he was able to present all the evidence he wanted to present at the hearings.
 
 
 41
 In order for a hearing to afford an individual due process, the hearing tribunal must be impartial. A tribunal is not impartial if it is biased with respect to the factual issues to be decided at the hearing. Miller v. City of Mission, Kansas, 705 F.2d 368, 372 (10th Cir.1983). This Court has held that a substantial showing of personal bias is required to disqualify a hearing officer or tribunal in order to obtain a ruling that a hearing is unfair. Roberts v. Morton, 549 F.2d 158, 164 (10th Cir.1977), cert. denied, 434 U.S. 834, 98 S.Ct. 121, 54 L.Ed.2d 95 (1977). Aside from the regents' May 22, 1981, statement that the alleged acts of homosexual solicitation were utterly unacceptable on a university campus and that the regents supported the OSU administration in its curtailment of public solicitation of homosexual activity, the record utterly fails to establish a substantial showing of personal bias on the part of the regents. The regents, armed with all of the prior proceedings, acted in executive session in terminating Corstvet. Thereafter, although Corstvet was notified of his right to request a post-termination hearing before the regents, he declined to do so. The post-termination hearing would have provided Corstvet an opportunity to present evidence and made a record on his contention of personal bias. He elected not to do so.
 
 
 42
 The fact that the two advisory committees recommended against termination (although both requested that Corstvet be terminated immediately if a similar incident reoccurred) and the regents acted contra in terminating Corstvet, does not establish a denial of Corstvet's due process rights. We hold that the record fails to establish that Corstvet was denied due process in his termination.
 
 
 43
 AFFIRMED.
 
 
 
 [1]
 Hereinafter collectively referred to as appellees